JDN

**WO**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

Roger Wayne Preayer,

                 Plaintiff,

vs.

Charles L. Ryan, et al.

                 Defendants.

No.   CV 15-00069-PHX-DGC (DKD)

**ORDER**

      Plaintiff Roger Wayne Preayer brought this pro se civil rights action under 42 U.S.C. § 1983 against seven Arizona Department of Corrections (ADC) employees: (1) Deputy Warden D. Schuster; (2) Lieutenant Maryellen Ohshita; (3) Lieutenant Cheryl Malysa; (4) Corrections Officer (CO) Maria Piller; (5) CO II Jaudiel Barajas; (6) CO II Eduardo Arreola; and (7) Nurse Practitioner Carey Tucker.  (Doc. 61).[1]  Before the Court are a Motion for Summary Judgment filed by Schuster, Ohshita, Malysa, and Piller (hereinafter "Defendants") (Doc. 71); Preayer's Objection to the Motion for Summary Judgment as Premature (Doc. 73); and Preayer's Motion to Strike Portions of Defendants' Statement of Facts  (Doc. 84.)[2]

---

     [1]  Preayer is currently housed at the Red Rock Correctional Center in Eloy, Arizona.  (Doc. 21.)

     [2]  Also before the Court is Tucker's Motion for Summary Judgment for Failure to Exhaust Administrative Remedies, which will be addressed in a separate Order. (Doc. 92.)

1    The Court will overrule Preayer's Objection, deny Preayer's Motion to Strike, and

2    grant in part and deny in part Defendants' Motion for Summary Judgment.

3    **I.     Background**

4    In Count I of his First Amended Complaint, Preayer alleges that he was subject to

5    unconstitutional conditions of confinement for months when he was housed in an

6    isolation cell at the Arizona State Prison Complex (ASPC)-Lewis, Morey Unit.

7    (Doc. 61.)   Preayer avers that he did not have a working toilet or sink, was denied

8    cleaning supplies, was not allowed to wash his clothes, and was not allowed to shave or

9    comb his hair.   (*Id.*)   Preayer states that he was forced to drink water from the staff

10   restroom or the inmate shower using a one-gallon water bottle given to him by staff and,

11   when he had to use the restroom, he had to push the cell's emergency call button to get

12   staff's attention, but it sometimes took hours for staff to respond.   (*Id.*)   He also states that

13   his meals were sometimes served hours late or not at all.   (*Id.*)   Preayer alleges that

14   Barajas and Arreola failed to conduct welfare checks or respond to the emergency call

15   button, and Malysa, Schuster, Pillar, and Ohshita were notified of the conditions of

16   confinement either in person or via grievances but failed to remedy the situation.   (*Id.*)

17   In Count II, Preayer alleges that he received inadequate medical care when Tucker

18   refused to renew Preayer's high blood pressure medication and Preayer subsequently lost

19   consciousness due to extremely high blood pressure and required emergency treatment.

20   (*Id.*)[3]

21   The Motion for Summary Judgment pertains only to the claim in Count I.

22   (Doc. 71.)   Schuster, Ohshita, Malysa, and Piller argue that they are entitled to summary

23   judgment because, although Preayer did not have a working toilet or sink, was denied a

24

25   _____

26   [3] In his summary judgment briefing, Preayer presents facts regarding the May 29, 2014 incident when he was found unconscious in his cell.   (*See* Doc. 75 at 6–7; Doc. 76 ¶ 12.)   These facts relate only to the claims against Tucker, Barajas, and Arreola.   (*See* Doc. 61 at 15, 17, 20.)   Barajas and Arreola were not served until after the pending Motion for Summary Judgment was filed.   (Docs. 85–86.)   As stated, Tucker's Motion for Summary Judgment will be addressed in a separate Order.   Therefore, the facts related to the May 29, 2014 incident are not addressed in this order.

27

28

comb, and received late meals, the conditions did not rise to the level of an unconstitutional violation and Defendants did not act with deliberate indifference. (*Id.*)[4]

Preayer filed an Objection to Defendants' Motion for Summary Judgment as Premature. (Doc. 73.) He then filed his opposition to Defendants' Motion and a "Motion to Strike Portions of Defendants' [Statement of Facts] and Motion for Summary Judgment and Request for Sanctions." (Docs. 75, 84.) Preayer asserts that following his deposition, he timely completed the Changes and Corrections errata form and mailed it to defense counsel; however, Defendants did not incorporate the corrections into their subsequently filed Motion for Summary Judgment and purposely misstated facts to the Court. (Doc. 84 at 1–2.) Preayer requests that the Court strike those paragraphs in Defendants' Statement of Facts that rely on portions of his deposition that were supposed to be corrected and that the Court sanction defense counsel for its conduct. (*Id.*)

Defendants oppose the Motion to Strike on the ground that Preayer made eleven corrections to his deposition testimony and only one of those corrections has any effect on Defendants' Motion for Summary Judgment, but that effect is not material. (Doc. 88.)

## II.    Procedural Issues

### A.    Preayer's Objection to Defendants' Motion for Summary Judgment

This action was initiated in January 2015, and a Scheduling Order was issued that set an October 5, 2015 discovery deadline and a December 4, 2015 dispositive motion deadline. (Docs. 1, 5, 16.) The Court granted extensions to discovery and reset the dispositive motion deadline for January 19, 2016. (Doc. 41.) In December 2015, Preayer moved for a temporary stay of proceedings so that he could amend his pleading. (Doc. 58.) On January 8, 2016, the Court granted his request for a stay, stayed all deadlines, and provided time for Preayer to file a First Amended Complaint. (Doc. 60.) In its Order, the Court indicated that it would issue a separate revised Scheduling Order.

---

[4] The Court issued an Order with the Notice required under *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc), which informed Preayer of the requirements under Federal Rule of Civil Procedure 56. (Doc. 72.)

(*Id.*)  Preayer filed his First Amended Complaint on January 22, 2016; he set forth the same claims against Defendants and added three new defendants.  (Doc. 61.)  On February 11, 2016, Schuster, Ohshita, Malysa, and Pillar filed their Answer and their pending Motion for Summary Judgment. (Docs. 66, 71.)  On May 23, 2016, the Court issued an Amended Scheduling Order, which set a new discovery deadline of August 23, 2016, and a new dispositive deadline of October 22, 2016.  (Doc. 91.)

In his Objection to Defendants' Motion for Summary Judgment, Preayer asserts that he added three new defendants in his First Amended Complaint—defendants who had not yet been served when Defendants filed their Motion for Summary Judgment.  (Doc. 73 at 2.)  Preayer contends that discovery as to these new defendants may yield evidence that corroborates his claims, and, until that discovery is completed, he is unable to adequately respond to the pending Motion for Summary Judgment.  (*Id.* at 2–3.)  He therefore requests that the Court deny the Motion for Summary Judgment as premature.  (*Id.* at 3.)

The allegations in Preayer's First Amended Complaint against Schuster, Ohshita, Malysa, and Pillar are identical to the allegations against them in the original Complaint.  (*See* Docs. 1, 61.)  From July to December 2015, the parties engaged in discovery as to the claims against Schuster, Ohshita, Malysa, and Pillar.  (*See* Docs. 23, 33, 40, 45, 52.)  Certainly, Defendants could have waited to file a summary judgment motion in accordance with the new deadlines, but they chose not to, and nothing in the Federal Rules of Civil Procedure precluded them from filing a summary judgment motion when they did.  *See* Fed. R. Civ. P. 56(b) ("[u]nless a different time is set by local rule or the court orders otherwise, a party may file a motion for summary judgment at any time until 30 days after the close of all discovery").  Preayer does not identify any specific reasons why he cannot present facts in opposition to Defendants' Motion for Summary Judgment; he merely speculates that there may be additional evidence uncovered during discovery as to the newly added defendants.  This is insufficient to stay a ruling on the Motion or deny it as premature.  *See* Fed. R. Civ. P. 56(d).

Accordingly, Preayer's Objection is overruled, and his request that the Court deny the Motion for Summary Judgment as premature will be denied.

**B.      Preayer's Motion to Strike**

Under Federal Rule of Civil Procedure 30(e), a deponent must be provided 30 days after notice that a deposition transcript is available to review the transcript and sign a statement listing any changes in form or substance.  On January 14, 2016, within the 30-day period, Preayer signed and dated a Change/Correction errata form and returned it to Defendants.  (Doc. 84 at 6–9).  It is troubling that Defendants subsequently failed to incorporate the corrections to Preayer's deposition transcript in their Statement of Facts. Preayer does not, however, specify the specific portions of Defendants' Statement of Facts that he believes should be stricken in light of the corrections to his deposition transcript.  (*See* Doc. 84.)  Defendants submit that the only erratum relevant to the Motion for Summary Judgment is Preayer's correction that he lost weight while housed at the Morey Unit, and Defendants stipulate to this fact.  (Doc. 88 at 2.)[5]

The Court will deny Preayer's Motion to Strike.  *See Johnson v. Cal. Medical Facility Health Servs.*, 2015 WL 4508734, at *6 (E.D. Cal. July 24, 2015) (motions to strike are generally disfavored and "should not be granted unless it is clear that the matter to be stricken could have no possible bearing on the subject matter of the litigation") (quoting *Neveu v. City of Fresno*, 392 F. Supp. 2d 1159, 1170 (E.D. Cal. 2005)).  But the Court will consider Preayer's corrections set forth in the Change/Correction errata form, which is attached to the Motion to Strike.  (Doc. 84, Attach.)  Also, to avoid unnecessary disputes over interpretations of the evidence, when possible, the Court will rely directly on the deposition transcript, the errata form, and other documentary evidence when ascertaining the relevant facts.

/ / /

---

[5] In his deposition, Preayer indicated that his weight has fluctuated throughout his incarceration, but he could not recall if he had lost weight during his 17 weeks in the Morey Unit.  (Doc. 69, Ex. A, Preayer Dep. 29:18–30:4, Dec. 15, 2015 (Doc. 69-1 at 1–20).)

1    **III.    Summary Judgment Standard**

2         A court must grant summary judgment "if the movant shows that there is no

3    genuine dispute as to any material fact and the movant is entitled to judgment as a matter

4    of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23

5    (1986).  The movant bears the initial responsibility of presenting the basis for its motion

6    and identifying those portions of the record, together with affidavits, if any, that it

7    believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at

8    323.

9         If the movant fails to carry its initial burden of production, the nonmovant need

10   not produce anything. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d

11   1099, 1102–03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the

12   burden then shifts to the nonmovant to demonstrate the existence of a factual dispute and

13   that the fact in contention is material (a fact that might affect the outcome of the suit

14   under the governing law) and that the dispute is genuine (the evidence is such that a

15   reasonable jury could return a verdict for the nonmovant).  *Anderson v. Liberty Lobby,*

16   *Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d

17   1216, 1221 (9th Cir. 1995).  The nonmovant need not establish a material issue of fact

18   conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–

19   89 (1968); but it must "come forward with specific facts showing that there is a genuine

20   issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574,

21   587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

22        At summary judgment, the judge's function is not to weigh the evidence and

23   determine the truth, but to determine whether there is a genuine issue for trial. *Anderson*,

24   477 U.S. at 249.  In its analysis, the court does not make credibility determinations; it

25   must accept the nonmovant's evidence and draw all inferences in the nonmovant's favor.

26   *Id.* at 255; *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  The

27   court need consider only the cited materials, but it may consider any other materials in

28   the record. Fed. R. Civ. P. 56(c)(3).

1    **IV.    Relevant Facts**

2            On January 7, 2014, Preayer was transferred from the Arizona State Prison

3    Complex (ASPC)-Lewis, Stiner Unit, to an isolation cell in the Transitory Unit, which is

4    within the Lewis, Morey Unit. (Doc. 69, Defs.' Statement of Facts ¶ 7.) At the relevant

5    time, there were 16 inmates housed in the Transitory Unit. (*Id.* ¶ 11.) Inmates are

6    housed in the Transitory Unit due to disciplinary problems, a need for protection from

7    other inmates, or to await other housing. (*Id.* ¶ 13.) Preayer was placed in the Transitory

8    Unit because he had turned over another inmate's contraband weapons, thereby

9    compromising his own safety. (*Id.* ¶ 7.) Preayer was housed in an isolation cell for about

10   17 weeks—from January 7 to May 8, 2014. (*Id.* ¶ 9.)

11           The toilet/sink, which was a single, combined apparatus, did not work when

12   Preayer was placed in the cell, and there was no running water. (*Id.* ¶¶ 17, 21.) On

13   January 9, 2014, a repair order to fix the toilet/sink was submitted. (*Id.* ¶ 22.) The

14   toilet/sink did not work for the first 8 weeks that Preayer was housed in the cell. (*Id.*

15   ¶ 21.) Defendants state that corrections staff and Preayer "worked out a system" that

16   when Preayer needed to use the bathroom, he would notify staff by pushing the call

17   button in his cell and staff would respond and take him to the bathroom. (*Id.* ¶ 24.)

18           Preayer denies that he ever worked out a system with corrections staff. (Doc. 76,

19   Pl.'s Statement of Facts ¶ 1;[6] Doc. 77, Pl.'s Disputed Facts ¶ 1.) Preayer states that when

20   he was placed in the cell, a CO handed him a one-gallon water bottle and told him that

21   the sink and toilet in the cell did not work and Preayer had to use the bottle for water.

22   (Doc. 76 at 2.) The CO also told him if he needed water or to use the bathroom, to push

23   the emergency button and someone would assist him. (*Id.*) Preayer states that he

24   objected to being housed in a cell without running water or an operable toilet, but he was

25   
26   _____

27           [6] Defendants object to Preayer's ¶ 1 on the grounds that it is speculation and lacks
     foundation. (Doc. 82 at 3.) The objection is overruled. The parties simply dispute
28   whether Preayer and prison staff agreed on a system for Preayer to use the call button
     when he needed to use the restroom or whether staff just told him that this is what he had
     to do. A dispute is not a basis for an objection.

1    forced to remain in the cell.  (Doc. 76, Ex. A, Preayer Decl. ¶¶ 9–10 (Doc. 76 at 14).)

2    Preayer avers that when he needed to empty his bowels, he would push the emergency

3    button, but no one would respond.  (*Id.* ¶ 14.)  He states he would have to resort to

4    banging and kicking the cell door for a long time before an officer would show up.  (*Id.*

5    ¶ 15.)  Preayer testifies that he never soiled his pants because he could not get to the

6    bathroom on time.  (Doc. 69, Ex. A, Preayer Dep. 52:23–25 (Doc. 69-1 at 36).)

7           Preayer further avers that without running water he was unable to wash his hands

8    or face, brush his teeth, or flush the toilet—which accumulated with urine and created a

9    stench.   (Doc. 76, Ex. A, Preayer Decl. ¶ 17.)   Preayer explains that he took the

10   cellophane wrapping that came with his sack lunch and placed it over the toilet to try to

11   cover the stink, removing the cellophane when he had to urinate.  (Doc. 69, Ex. A,

12   Preayer Dep. 51:25–52:14 (Doc. 69-1 at 35–36).)

13          Preayer states that he was never provided cleaning supplies to sanitize his sink or

14   toilet or to sweep or mop his cell.  (Doc. 76, Ex. A, Preayer Decl. ¶¶ 64–65 (Doc. 76 at

15   17).)  And he testifies that no one ever entered his cell to clean it.  (Doc. 69, Ex. A,

16   Preayer Dep. 52:22–53:3 (Doc. 69-1 at 36–37).)

17          When Preayer entered the isolation cell, he had only the clothes he was wearing,

18   and he did not purchase any clothes during the time he was housed in the Morey Unit.

19   (Doc. 76 ¶¶ 3–4 (Doc. 76 at 2).)  Preayer states that he was not allowed to wash his single

20   set of clothes—a t-shirt, long pants, a sweatshirt, a pair of socks, and underwear—

21   because the sink in his cell did not work, and officers would not let inmates in isolation

22   take clothes to the laundry.  (*Id.* ¶ 53; Doc. 69, Ex. A, Preayer Dep. 48:6–11, 49:3–8

23   (Doc. 69-1 at 32–33).)  Preayer testifies that he asked for a second set of clothes, which

24   he had in the property room, but he was told he could only have one set of clothes.

25   (Doc. 69, Ex. A, Preayer Dep. 48:15–21 (Doc. 69-1 at 32).)  Defendants state that

26   inmates routinely wash their own clothes in the sinks in their cells or when they get a

27   shower, and that Preayer had the opportunity to wash his clothes in his sink after it was

28   repaired on March 3, 2014.  (Doc. 69 ¶¶ 23, 44–45.)

1    When he was placed in the isolation cell, Preayer was given a "bedroll" consisting

2    of toilet paper, a little bag of toothpaste and a toothbrush, a little bar of soap, a small tube

3    of shampoo, a blanket and sheet, and a towel.  (Doc. 69, Ex. A, Preayer Dep. 40:15–22

4    (Doc. 69-1 at 27).)  Defendants state that Preayer had soap, shampoo, toothpaste, a tooth

5    brush, and a towel in his cell.  (Doc. 69 ¶ 28.)  On January 14 and 22, and February 4,

6    2014, Preayer purchased soap from the prison store. (Doc. 69, Ex. F-1 (Doc. 69-3 at 13-

7    15).)[7]

8    Preayer testifies that he was offered recreation out of his cell about every other

9    day.  (Doc. 69, Ex. A, Preayer Dep. 39:1–8 (Doc. 69-1 at 26).)  Recreation for those in

10   the isolation cells was offered late at night; non-detention inmates went to recreation

11   during the day.  (*Id.* 38:5–7.)  When Preayer was offered recreation, he could either go to

12   recreation or take a shower.  (*Id.* 38:10–18.)  Preayer most often chose a shower; he went

13   to recreation just 3 or 4 times during the 17 weeks that he was housed at the Morey Unit.

14   (*Id.* 38:19–23.)  When he took a shower, he was not provided soap or shampoo.  (*Id.*

15   39:9–13.)  He was provided toothpaste and a toothbrush so he would brush his teeth when

16   he took a shower every other day.  (*Id.* 39:19–40:7.)

17   Preayer states that he asked officers almost daily to let him shave, but they told

18   him that razors were not permitted.  (Doc. 76 ¶ 3.)  Defendants confirm that razors are not

19   allowed in cells in the Transitory Unit, and that Preayer did not shave during the 17

20   weeks he was housed at the Morey Unit.  (Doc. 69 ¶¶ 39–40.)  Defendants state that

21   inmates could ask the officer on duty to use the electric shaver that was stored in the

22   control room, but the shaver was not always functional.  (*Id.* ¶¶ 41–42.)  When Preayer

23   was escorted to the shower, often around 1:00 a.m., he would ask for a barber, but was

24   told that the inmates who worked as barbers were asleep or was given other excuses.

25   (Doc. 69, Ex. A, Preayer Dep. 46:6–15 (Doc. 69-1 at 30).)  Consequently, Preayer's

26   _____

27         [7] Defendants also state that Preayer purchased soap and a sweatshirt on January 7, 2014, but the record shows that because Preayer was moved later that same day, he never

28   received these items and was refunded his money.  (Doc. 69 ¶¶ 36, 47, Ex. F-1; Doc. 76, Ex. S (Doc. 76 at 89).)

- 9 -

1    beard grew to 5 or 6 inches long.  (*Id.* 42:5–7.)

2            Preayer testifies that he asked for comb, but was told he could not have one in the

3    isolation cell.  (*Id.* 41:15–17, 41:22–23 (Doc. 69-1 at 30).)  He states that because he was

4    never given a comb, he had to put his hair in plats to keep it from knotting up.  (*Id.* 42:1–

5    4.)  Defendants state that a comb was not part of the hygiene kit provided to Preayer, but

6    ADC policy did not prohibit combs in isolation cells. (Doc. 69 ¶ 32.)  Defendants note

7    that Preayer tried to purchase a hair pick on February 4, 2014, and the prison store denied

8    the order by mistake.  (*Id.* ¶¶ 33–34.)

9            The standard meal schedule is three meals a day, Monday through Friday, and two

10   meals a day on Saturday and Sunday.  (Doc. 69 ¶¶ 54–58.)  Preayer testifies that during

11   his time in isolation his meals were served late or not at all.  (Doc. 69, Ex. A, Preayer

12   Dep. 56:1–6 (Doc. 69-1 at 39).)  He states that he missed meals once or twice a week; he

13   would not be served lunch, and then, at dinner time, he would be given two sack lunches.

14   (*Id.* 55:10–24.)  Preayer testifies that it was fair to say he was fed two meals a day, but he

15   lost weight while he was at the Morey Unit.  (*Id.* 57:6–8; Doc. 84, Preayer Dep.

16   Change/Corr. errata form at 2 (Doc. 84 at 8).)  Defendants explain that there are set times

17   for meal delivery to the isolation cells, but delivery of all meals could be delayed due to

18   unexpected yard or kitchen issues.  (Doc. 69 ¶¶ 54–58.)

19           Preayer states that he spoke personally with Malysa on several occasions about his

20   complaints, but nothing was done to rectify the situation, and she would only tell him that

21   she would look into it.  (Doc. 76, Ex. A, Preayer Decl. ¶ 19 (Doc. 76 at 14).)

22           On January 29, 2014, Preayer submitted his first Informal Resolution/Inmate

23   Letter, which is the first step in the ADC grievance procedure.  (*Id.*, Ex. C (Doc. 76 at

24   21).)  The face of the form shows that it is addressed to Schuster and Piller, it complains

25   about his conditions of confinement and the officers' failure to respond to the call button,

26   and it states that he has spoken to staff members about the problems.  (*Id.*)  There was no

27   response to this Inmate Letter.

28           On February 14, 2014, Preayer submitted another Inmate Letter addressed to

- 10 -

Schuster and Piller.  (*Id.* (Doc. 76 at 22).)  In this second Inmate Letter, Preayer wrote that he previously submitted an Inmate Letter on January 29, 2014; that he has been in isolation for over a month; and that he still had an inoperable toilet/sink, could not shave or comb his hair, was not allowed to clean or sanitize his cell, and remained in the same clothes which he had not been allowed to wash.  (*Id.*)  Preayer again indicated that he had spoken with staff members about these issues.  (*Id.*)  There was no response to this Inmate Letter.

Piller states that she could not find the January 29 and February 14, 2014 Inmate Letters in her files.  (Doc. 69, Ex. B, Piller Decl. ¶ 15 (Doc. 69-2 at 4).)

On March 15, 2014, Preayer submitted an Inmate Grievance, the second step in the grievance procedure.  (*Id.*, Ex. C-1 (Doc. 69-2 at 24–25).)  He wrote that he had submitted several Inmate Letters about problems with his cell and with the failure of building officers to respond to calls or check the isolation cells.  (*Id.*)  Under the ADC grievance procedure, a formal Inmate Grievance goes to the CO IV/Grievance Coordinator, who investigates the complaint on behalf of the Deputy Warden, and the Deputy Warden has 15 workdays to respond in writing to the inmate.  (Doc. 76, Ex. H, Ohshita Interrog. Resp. No. 19 (Doc. 76 at 46).)  Ohshita, the Grievance Coordinator, states that formal grievances are routed to her administrative mailbox.  (Doc. 69, Ex. C, Ohshita Decl. ¶ 13 (Doc. 69-2 at 20).)  She states that she should have received Preayer's March 15, 2014 Inmate Grievance a day or two later, but she did not receive it until May 1, 2014.  (*Id.* ¶ 15.)

Meanwhile, on April 11, 2014, Preayer submitted another Inmate Letter addressed to Schuster.  (Doc. 76, Ex. C (Doc. 76 at 23).)  In this Inmate Letter, Preayer explained that he had been in isolation since January 7, 2014, and had made every attempt to get someone to address his problems.  (*Id.*)  He wrote that he had submitted several Inmate Letters to Schuster, Piller, CO IV Chavez, and Sergeant Smith, and that he had personally spoken with Lt. Malysa.  (*Id.*)  Preayer stated that he had not received a response from anyone.  (*Id.*)  There was no response to this Inmate Letter.

1        Having received no response to his March 15, 2014 Inmate Grievance, on
2    April 24, 2014, Preayer submitted an Inmate Grievance Appeal, the third step in the ADC
3    grievance policy.  (Doc. 76, Ex. I (Doc. 76 at 51).)  This Grievance Appeal was directed
4    to Schuster.  (*Id.*)

5        On April 28, 2014, Preayer submitted another Inmate Letter addressed to Schuster
6    and Piller in which he complained about the conditions of his confinement and requested
7    various remedies.  (*Id.*, Ex. C (Doc. 76 at 25).)  There was no response to this Inmate
8    Letter.

9        Preayer states that on May 1, 2014, Ohshita came to his cell with his unanswered
10   April 24, 2014 Inmate Grievance Appeal—to which he had attached a copy of his
11   unanswered March 15, 2014 Inmate Grievance.  (*Id.* (Doc. 76 at 28).)  Preayer asserts
12   that Ohshita handed back his Appeal and stated that she was going to answer his Inmate
13   Grievance.  (*Id.* (Doc. 76 at 28).)  Preayer explained to her that it was too late because he
14   had already filed his Appeal, which he was permitted to do after receiving no response to
15   his Inmate Grievance within the time period specified in the ADC grievance procedure.
16   (*Id.*)

17       Later on May 1, 2014, Preayer submitted an Inmate Letter to Piller and Schuster
18   documenting the encounter with Ohshita, complaining that officials were not complying
19   with the grievance procedure rules, and requesting that he be able to move forward with
20   his original April 24, 2014 Inmate Grievance Appeal.  (*Id.* (Doc. 76 at 27).)

21       On May 2, 2014, Preayer submitted another Inmate Letter form to Piller.  (*Id.*
22   (Doc. 76 at 29).)  Preayer again recounted the encounter with Ohshita, stated he would
23   not acknowledge any untimely response from the Grievance Coordinator, and requested
24   that his April 24, 2014 Appeal be returned to the Deputy Warden for his response.  (*Id.*)

25       On May 5, 2014, Preayer received a response to the March 15, 2014 Inmate
26   Grievance.  (Doc. 69, Ex. C-1 (Doc. 69-2 at 24).)  The bottom half of the Inmate
27   Grievance form was signed by Ohshita and dated May 1, 2014, and attached to it was the
28   Inmate Grievance Response form, signed by Schuster and also dated on May 1, 2014.

1    (*Id.* (Doc. 69-1 at 23–24).)  In his Response, Schuster wrote that he agreed that operation

2    of the isolation cell area needs to be improved and that officials were putting a system in

3    place to better manage operation of these cells and ensure that the inmates' needs were

4    not neglected.  (*Id.*)

5         On May 7, 2014, Preayer filed a Final Grievance Appeal to the Director, the final

6    step in the grievance procedure.  (Doc. 61 at 7.)  Preayer was moved out of the Transitory

7    Unit on May 8, 2014.  (Doc. 69 ¶ 9.)

8    **V.    Eighth Amendment**

9         "The Eighth Amendment prohibition against cruel and unusual punishment

10   protects prisoners not only from inhumane methods of punishment but also from

11   inhumane conditions of confinement."  *Morgan v. Morgensen*, 465 F.3d 1041, 1045 (9th

12   Cir. 2006).   Conditions of confinement may be restrictive and harsh, but they cannot

13   involve the "wanton and unnecessary infliction of pain" or be devoid of a legitimate

14   penological purpose.  *Id.* (citing *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981), and

15   *Hudson v. Palmer*, 468 U.S. 517, 548 (1984)).

16        Where a prisoner alleges injuries stemming from unsafe conditions of

17   confinement, prison officials may be held liable only if they acted with "deliberate

18   indifference to a substantial risk of serious harm."  *Frost v. Agnos*, 152 F.3d 1124, 1128

19   (9th Cir. 1998).   The deliberate indifference standard involves an objective and a

20   subjective prong. First, the plaintiff must show that the alleged deprivation was

21   "sufficiently serious" to rise to the level of an Eighth Amendment violation.  *Farmer v.

22   Brennan*, 511 U.S. 825, 834 (1994) (citing *Wilson v. Seiter*, 501 U.S. 294, 298 (1991));

23   *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000).  Extreme deprivations are required

24   to support an Eighth Amendment conditions-of-confinement claim.   *Hudson v.

25   McMillian*, 503 U.S. 1, 9 (1992) (citation omitted).  "Only those deprivations denying the

26   minimal civilized measure of life's necessities are sufficiently grave to form the basis of

27   an Eighth Amendment violation."   *Id.* (quotations and citations omitted).   When

28   determining whether an alleged deprivation is objectively sufficiently serious to support a

constitutional claim, a court must consider the circumstances, nature, and duration of a deprivation. *Johnson*, 217 F.3d at 731–32. "The more basic the particular need, the shorter the time it can be withheld." *Hoptowit v. Ray*, 682 F.2d 1237, 1259 (9th Cir. 1982), *abrogated in part on other grounds by Sandin v. Connor*, 515 U.S. 472 (1995).

Second, the plaintiff must show that the prison official acted with a "sufficiently culpable state of mind" – that is, that the official "kn[ew] of and disregarded an excessive risk to inmate health or safety . . . ." *Farmer*, 511 U.S. at 837; *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010) ("the inmate must show that the prison officials had no 'reasonable' justification for the deprivation"). Thus, a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that a prisoner faces a substantial risk of harm and disregards that risk by failing to take reasonable measures to abate it. *Farmer*, 511 U.S. at 837–45. Mere negligence is insufficient to establish liability; the official's conduct must have been wanton. *Id.* at 835; *Frost*, 152 F.3d at 1128. Prison officials may avoid liability by presenting evidence that they lacked knowledge of the risk, or by presenting evidence of a reasonable, albeit unsuccessful, response to the risk. *Farmer*, 511 U.S. at 844–45.

## VI.    Discussion

### A.    Objective Component

The first step in the deliberate indifference analysis is to determine if Preayer's confinement in the isolation cell deprived him of the "the minimal civilized measure of life's necessities." *Hudson*, 503 U.S. at 9. It is well-settled that subjecting "a prisoner to lack of sanitation that is severe or prolonged can constitute an infliction of pain within the meaning of the Eighth Amendment." *Anderson v. Cnty. of Kern*, 45 F.3d 1310, 1314–15 (9th Cir. 1995) (citing cases). In *Anderson*, the Ninth Circuit recognized that confining an inmate for five days in a strip cell with only a pit toilet and without a sink or other washing facilities satisfied the objective component of the Eighth Amendment. *Id.* at 1315 (citing *LaReau v. MacDougall*, 473 F.2d 974, 978 (2d Cir. 1972)). In *Johnson v. Lewis*, the Ninth Circuit found that substantial deprivations of shelter, food, drinking

water, and sanitation for four days were sufficiently serious to establish an Eighth Amendment claim.  217 F.3d at 731–32.

Defendants acknowledge for the purposes of their Motion for Summary Judgment that, to some degree, Preayer was subject to an inoperable toilet and sink, denied a comb or the ability to shave, and was served meals late.  (Doc. 71 at 7.)  But they argue that these conditions did not rise to a constitutional violation because (1) a repair order for the toilet/sink was submitted within two days of Preayer's placement in the cell; (2) Preayer had access to a toilet during the time his cell toilet was inoperable and was never denied toilet access for any significant time; (3) Preayer had consistent and daily access to potable water via a one-gallon water bottle filed upon his request; (4) Preayer suffered no injury due to the lack of a comb; (5) Preayer had access to a shower usually three times a week and had a toothbrush, toothpaste, and a towel in his cell; (6) Preayer had the opportunity to wash his clothes in his sink after it was repaired in March or to send his clothes to the laundry; and (7) Preayer received at least two meals every day and did not suffer malnourishment.  (*Id.* at 7–13.)

Preayer contends that the conditions of his confinement did not meet the minimal civilized measure of life's necessities.  (Doc. 75 at 12–13.)

### 1.     Toilet/Sink

A temporary deprivation of access to a toilet or to water, absent resulting harm, generally does not amount to a sufficiently serious deprivation under the Eighth Amendment.  *See Johnson*, 217 F.3d at 733 ("toilets can be unavailable for some period of time without violating the Eighth Amendment"); *Minifield v. Butikofer*, 298 F. Supp. 2d 900, 904 (N.D. Cal. 2004) (a five hour deprivation of water did not rise to the level of an Eighth Amendment violation); *see also Kanvick v. Nevada*, 3:08-CV-00397-ECR-VPC, 2010 WL 2162324, at *1, 5–6 (D. Nev. Apr. 27, 2010) ("a temporary deprivation of access to toilets, in the absence of physical harm or a serious risk of contamination, does not rise to the level of an Eighth Amendment violation"; thus, denial of access to

1  restrooms lasting up to two hours was not sufficient to support an Eighth Amendment

2  claim).

3         But this was no temporary deprivation.  Plaintiff was in a cell for months without

4  an operable toilet, had to use an emergency call button to request use of the restroom, and

5  then was required to wait—sometimes hours—for a response.  (Doc. 75 at 12.)  Further,

6  Preayer alleged that he often had to urinate into the nonworking toilet in his cell and was

7  exposed to the stench of his own accumulated urine for two months.  (Doc. 76, Ex. A,

8  Preayer Decl. ¶ 17 (Doc. 76 at 14).)  *See DeSpain v. Uphoff*, 264 F.3d 965, 972, 974–75

9  (10th Cir. 2001) (conditions constituted sufficiently serious deprivation under the Eighth

10  Amendment where, after flooding in the cell unit, the prisoner-plaintiff lacked access to

11  working toilet for 36 hours and was exposed to his own accumulated urine in his cell

12  toilet and was exposed to other inmates' urine and feces via standing water in the

13  hallways outside of his cell).

14         That Preayer had a toothbrush, toothpaste, and towel in his cell means little

15  without running water.  Preayer could have used water from his one-gallon bottle to

16  brush his teeth or rinse his face, but only at the risk of having little or no available

17  drinking water for an undetermined period of time, given his allegations that officials did

18  not timely respond to the emergency call button or regularly check the isolation cells.

19  (Doc. 76, Ex. A, Preayer Decl. ¶¶ 14–15, 59 (Doc. 76 at 14, 17).)  *Johnson*, 217 F.3d at

20  732 (evidence that the plaintiffs were denied adequate drinking water or edible food or

21  adequate access to toilets for four days was sufficient to establish substantial deprivations

22  of basic human needs).  Defendants argue that the circumstances here are similar to those

23  in *Moran v. Dovey*, where the prisoner did not have running water in his cell but the

24  district court found no Eighth Amendment violation because there was no indication that

25  the prisoner did not receive liquids with his meals or that there was any serious risk of

26  harm to his health.  (Doc. 71 at 9–10 & Doc. 82 at 6, citing CV-00016-AWI-SMS PC,

27  2009 WL 276783, at *3 (E.D. Cal. Feb. 5, 2009).  But the prisoner in *Moran* was housed

28  in a cell without running water for one day.  2009 WL 276783, at *3.

1    Preayer's sworn statements establish that he had insufficient access to a toilet or to

2    running water for two months, and this satisfies the objective component of the deliberate

3    indifference analysis.

4                    **2.        Hygiene Items and Sanitation**

5            A comb is undeniably a basic personal hygiene item.  *See May v. Baldwin*, 895 F.

6    Supp. 1398, 1408 (D. Ore. 1995) (the plaintiff's personal hygiene needs were satisfied

7    where he was provided a towel, soap, a comb, and a toothbrush).  Indeed, ADC policy

8    provides that indigent inmates are to be given "the basic necessities," which include

9    "toothpaste, toothbrush, deodorant, shampoo, and comb." (Doc. 69, Ex. E, Malysa Decl.

10   ¶ 13 (Doc. 69-3 at 4).)  The record supports that Preayer had long hair but was denied a

11   comb or the opportunity to shave for 17 weeks.  (Doc. 69, Ex. A, Preayer Dep. 42:1–7

12   (Doc. 69-1 at 29).)  Although Defendants assert that there was an electric shaver—that

13   sometimes worked—in the control room, there is no evidence Preayer was informed of

14   this or ever offered this option.  (*See* Doc. 71 at 12.)  Rather, Preayer alleges that every

15   day he asked to be allowed to shave, but officers told him that razors were not permitted.

16   (Doc. 76, Ex. A, Preayer Decl. ¶ 62 (Doc. 76 at 17).)

17           Defendants rely on several cases.  (Doc. 82 at 7, citing cases; Doc. 82 at 6–7

18   (same).)  *See James v. O'Sullivan*, 62 F. App'x 636, 639 (7th Cir. 2003) (the denial of

19   soap, a toothbrush and toothpaste for the 49 days that the plaintiff was housed in

20   segregation may satisfy the objective component of the Eighth Amendment inquiry, but

21   the denial of a comb, deodorant, and cleaning supplies for that period did not jeopardize

22   his health and fails to meet objective component); *Matthews v. Murphy*, 956 F.2d 275, at

23   *4 (9th Cir. Feb. 25, 1992) (unpublished table decision) (no Eighth Amendment violation

24   where the plaintiff was deprived of a towel, toothbrush, toothpowder, comb, soap, and

25   other hygiene items for 34 days because there was no evidence that his conditions were

26   "generally unsanitary"); and *Eady v. Head*, CIV ASA04CA0648 NN, 2006 WL 2663776,

27   at *1–3 (W.D. Texas Sept. 15, 2006) (no deliberate indifference where the plaintiff was

28   provided a "hygiene pack" with basic hygiene items and the showers were out of order

for just two days during his 21-day confinement in county correctional center).  These cases concern deprivations lasting far less than the approximately 120 days that Preayer was housed in the Transitory Unit.  *See Johnson*, 217 F.3d at 731–32 (court must consider duration of a deprivation).

Moreover, unlike these cases, Preayer alleges that he was housed in a "filthy" and unsanitary cell, was denied cleaning supplies, and was denied clean clothes.  *See Hutto v. Finney*, 437 U.S. 678, 686–87 (1978) (conditions such as a filthy cell "may be tolerable for a few days and intolerably cruel for weeks or months"); *Johnson*, 217 F.3d at 731 (prison officials must provide adequate clothing and sanitation); *Toussaint v. McCarthy*, 597 F. Supp. 1388, 1410–11 (N.D. Cal. 1984), *rev'd in part on other grounds*, 801 F.2d 1080 (9th Cir. 1986) (officials have "an obligation to ensure that . . . clothing . . . is adequately laundered on a regular basis" and the Eighth Amendment is violated when weeks and months pass without a clothing exchange).  Defendants assert that Preayer could have laundered his clothes or bought more clothes (Doc. 71 at 11), but the Court must take as true Preayer's allegations that he was not allowed to send his clothes to be laundered, that his request for other clothes in the property room was denied, and that he was told he could have only one set of clothes.  (Doc. 76, Ex. A, Preayer Decl. ¶ 66 (Doc. 76 at 17); Doc. 69, Ex. A, Preayer Dep. 48:15–21 (Doc. 69-1 at 32).)  Defendants also assert that inmates can clean their cell at night if they choose to, but they do not explain how Preayer could have cleaned his cell without cleaning supplies or running water for the first two months of his confinement.  (Doc. 82 at 7.)

The Court finds genuine issues of material fact on whether denial of basic hygiene items, denial of cleaning supplies and clean clothes, and exposure to an unsanitary cell for 17 weeks constitutes a deprivation of basic necessities under the Eighth Amendment.

### 3.    Meals

"Adequate food is a basic human need[,]" *Keenan v. Hall*, 83 F.3d 1083, 1091 (9th Cir. 1996), and the Eighth Amendment requires that prisoners receive food that is adequate to maintain health.  *LeMaire v. Maass*, 12 F.3d 1444, 1456 (9th Cir. 1993).

"[I]nmates rely on prison officials to provide them with adequate sustenance on a daily basis[,]" and "[t]he repeated and unjustified failure to do so amounts to a serious deprivation." *Foster v. Runnels*, 554 F.3d 807, 814 (9th Cir. 2009).  Whether food is sufficient to maintain health is often determined by its nutritional and caloric values.  *See Florer v. Bales-Johnson*, 752 F. Supp. 2d 1185, 1200-01 (W.D. Wash. 2010) (finding that, in light of the prisoner-plaintiff's body weight and caloric needs, the prison's kosher meals, which provided an average of 2,380–2,910 calories per day, were sufficient to maintain his health); *see also Green v. Ferrell*, 801 F.2d 765, 770–71 (5th Cir. 1986) (finding two meals a day sufficient if nutritionally and calorically adequate); *Cunningham v. Jones*, 667 F.2d 565, 566 (6th Cir. 1982) (finding one meal a day for 15 days, where the meal contained 2,000 to 2,500 calories and was sufficient to maintain health, constitutionally adequate).  In *Foster*, the Ninth Circuit found a sufficiently serious deprivation where the prisoner was denied 16 meals in 23 days.  554 F.3d at 812–13.  The defendants in *Foster* failed to provide any evidence of the nutritional value of meals served to the prisoner, and, in light of his allegations that he lost weight and suffered headaches during the period he was denied meals, the only reasonable inference was that the meals provided were inadequate to maintain health and the prisoner suffered harm under the Eighth Amendment.  *Id.* at 213 n.2.

Defendants acknowledge that Preayer was supposed to receive three meals a day Monday through Friday and two larger meals on the weekends—a total of 19 meals a week.  (Doc. 69, Ex. E, Malysa Decl. ¶ 19 (Doc. 69-3 at 4).)  There appears to be no record of the number of meals actually served to Preayer during his time in isolation.  Preayer confirms that he was fed at least two meals a day.  (Doc. 69, Ex. A, Preayer Dep. 57:6–8 (Doc. 69-1 at 41).)  Two meals a day would be just 14 meals a week—a deprivation of 5 meals a week during the 17-week confinement.  This is a much more significant deprivation than those addressed in the cases relied on by Defendants to argue that there was no Eighth Amendment violation here.  (*See* Doc. 82 at 8, citing *Ahmorae v. Davidson Cnty. Sheriff's Off.*, 3:15-CV-0813, 2015 WL 4758168, at *2 (M.D. Tenn. Aug.

11, 2015) (plaintiff claimed that he was deprived of a meal on one occasion during Ramadan), and *Cagle v. Perry*, 9:04-CV-1151 (TJM/GHL), 2007 WL 3124806, at *7, 14 (N.D. N.Y. Oct. 24, 2007) (no Eighth Amendment violation where the plaintiff was deprived of two meals, one on Jan. 30, 2005, and one on March 18, 2005)).  Defendants provide no evidence of the nutritional or caloric value of the meals provided to Preayer, and he alleges that he lost weight during the relevant time and often went to bed hungry due to the inconsistent meal service.  (Doc. 84, Preayer Dep. Change/Corr. errata form at 2 (Doc. 84 at 8); Doc. 75 at 13.)  Under *Foster*, Preayer has established a sufficiently serious deprivation implicating the Eighth Amendment.

In sum, the Court finds that Preayer's exposure to the above conditions during his confinement in the isolation cell rise to the level of serious harm within the meaning of the Eighth Amendment, thereby satisfying the objective component.  *See Anderson*, 45 F.3d at 1314.

## B.    Subjective Component

Under *Farmer*, a prison official is not liable under the Eighth Amendment for denying an inmate humane conditions of confinement "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  511 U.S. at 837.  A plaintiff may show "that a prison official had the requisite knowledge of a substantial risk in the usual ways, including inference from circumstantial evidence."  *Id.* at 842.  Thus, a fact finder may conclude that an official knew of a substantial risk from the fact that the risk was obvious.  *Id.* at 843 n.8.  Moreover, "[t]urning a blind eye to the relevant surrounding facts will not shield a prison official from liability."  *Swan v. United States*, 159 F. Supp. 2d 1174, 1182 (N.D. Cal. 2001).  "*Farmer's* subjective standard does not invite prison supervisors to bury their heads in the sand."  *Walton v. Dawson*, 752 F.3d 1109, 1119 (8th Cir. 2014).  Therefore, liability may be imposed "if the evidence showed that [a prison official] merely refused to verify underlying facts that he strongly suspected to be

1   true, or declined to confirm inferences of risk that he strongly suspected to exist."
2   *Farmer*, 511 U.S. at 843 n.8.

3       The inquiry into a defendant's liability for deliberate indifference "must be
4   individualized and focus on the duties and responsibilities of each individual defendant
5   whose acts or omissions are alleged to have caused a constitutional deprivation." *Leer v.*
6   *Murphy*, 844 F.2d 628, 633 (9th Cir. 1988); *see Rizzo v. Goode*, 423 U.S. 362, 370–71,
7   375–77 (1976).

8                   **1.      Deputy Warden Schuster**

9       As a supervisor, Schuster may be liable for an Eighth Amendment violation if he
10  participated in or directed the violation, or knew of the violation and failed to act to
11  prevent it.  *Maxwell v. Cnty. of San Diego*, 708 F.3d 1075, 1086 (9th Cir. 2013) (citing
12  *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989)); *see Starr v. Baca*, 652 F.3d 1202,
13  1207 (9th Cir. 2011) ("[a] plaintiff may state a claim against a supervisor for deliberate
14  indifference based upon the supervisor's knowledge of and acquiescence in
15  unconstitutional conduct by his or her subordinates"); *see also Monell v. Dep't of Soc.*
16  *Servs.*, 436 U.S. 658, 691–92 (1978) (no respondeat superior liability under § 1983).

17      Defendants assert that subordinates within Schuster's chain of command—not
18  Schuster himself—had contact with prisoners and were responsible for overseeing prison
19  activities.  (Doc. 71 at 15.)  Schuster avers that he never met Preayer and did not receive
20  or read anything from Preayer until receipt of Preayer's Inmate Grievance Appeal on
21  May 1, 2014.  (Doc. 69, Ex. D, Schuster Decl. ¶ 7 (Doc. 69-2 at 28).)  Thus, Defendants
22  contend that Schuster was not aware of the conditions in Preayer's cell and did not
23  knowingly refuse to address those conditions.  (Doc. 71 at 15, 19.)

24      Preayer argues that Schuster should have known about the conditions in his cell in
25  light of at least six Inmate Letters that Preayer submitted to Schuster informing him of
26  the conditions.  (Doc. 75 at 10.)  Also, on March 15, 2014, Preayer submitted a formal
27  Inmate Grievance to which Schuster was supposed to respond within 15 workdays.
28  (Doc. 69, Ex. C-1 (Doc. 69-2 at 24–25).)

1    It is unclear how none of Preayer's grievance documents appeared to reach

2    Schuster until May 2014.  Even so, there is no evidence to show that this failure in the

3    grievance processing system was attributable to Schuster.  The grievance documents are

4    therefore insufficient to establish that Schuster knew of the conditions in Preayer's cell.

5    But Preayer points to other evidence relevant to whether Schuster had sufficient

6    knowledge of Preayer's conditions of confinement.   *See Farmer*, 511 U.S. at 842

7    (circumstantial evidence may show that an official must have known about the risk).

8    In his response to interrogatories, Schuster states that he was aware of the daily

9    activities of his officers and shift commanders assigned to the Morey Unit and that he

10   frequented the isolation cell area to ensure that officers there were properly performing

11   their duties.  (Doc. 76, Ex. K, Schuster Interrog. Resp. Nos. 16–17 (Doc. 76 at 57).)  Due

12   to an injury, beginning around February 20, 2014, Schuster was unable to walk the yard

13   and worked only inside his office.  (Doc. 69, Ex. D, Schuster Decl. ¶ 11 (Doc. 69-2 at

14   28).)  Schuster avers that although he was not aware of any specific cell's situation, he

15   "was aware of the general situation that the Morey Unit had numerous plumbing

16   problems during the relevant period."  (*Id.* ¶ 8.)  Further, in his May 1, 2014 Response to

17   Preayer's Inmate Grievance, Schuster acknowledged that operations of the isolation cell

18   area needed to be improved.  (Doc. 69, Ex. C-1 (Doc. 69-2 at 24).)

19   Schuster's statements support the inference that he was aware of plumbing issues

20   and operations problems in the isolation cell area.  More importantly, since Schuster

21   frequented the isolation cell area—at least until late February 2014—and was aware of

22   his officers' daily activities, it is reasonable to infer that he would have known that his

23   officers "worked out a system" to provide water and toilet access to a prisoner with an

24   inoperable toilet/sink, and that this prisoner was using the employee bathroom since his

25   arrival in the unit in early January 2014.  (*See* Doc. 71 at 4.)  As stated, Schuster cannot

26   avoid liability if the evidence shows that he simply refused to verify facts of which he

27   was aware or declined to confirm inferences of risk that he suspected were present.  *See*

28   *Farmer*, 511 U.S. at 843 n.8.  And here, Schuster does not present any argument to

1    suggest that the obviousness of the risk escaped him or that he believed that lack of

2    access to a toilet and running water for many weeks posed no risk to a prisoner.  *See*

3    *Farmer*, 511 U.S. at 844 (prison official may preclude liability if he shows he was aware

4    of underlying facts "but believed (albeit unsoundly) that the risk to which the facts gave

5    rise was insubstantial or nonexistent").  It is also reasonable to infer that Schuster would

6    have had knowledge of the meal service delays and that there was no laundry service,

7    cleaning service, or cleaning supplies provided to inmates in the isolation cells.

8         On this record, there is a genuine issue of material fact whether Schuster should

9    have been aware of a substantial risk to Preayer's health or safety but refused to

10   acknowledge facts known to him and, consequently, whether Schuster acted with

11   deliberate indifference.  *Farmer*, 511 U.S. at 843 n.8.  Summary judgment will be denied

12   to Schuster.

### 2.     Shift Commander Malysa

14        Malysa avers that subordinates within her chain of command were responsible for

15   contact with inmates and that no subordinate ever contacted her about Preayer during his

16   confinement in the Transitory Unit.  (Doc. 69, Ex. E, Malysa Decl. ¶¶ 5, 7 (Doc. 69-3 at

17   3).)  She further avers that she never received or read anything in writing from Preayer

18   until she was served with this lawsuit.  (*Id.* ¶ 6.)

19        Preayer specifically alleges, however, that on several occasions he personally

20   spoke with Malysa about his complaints and issues with his cell, but she did not take any

21   action.  (Doc. 76, Ex. A, Preayer Decl. ¶ 19 (Doc. 76 at 14); Doc. 69, Ex. A, Preayer Dep.

22   79:19–80:10 (Doc. 69-1 at 51–52).)  Preayer also documented in his grievance documents

23   that he spoke with Malysa about his issues.  (*Id.*, Ex. C (Doc. 76 at 24).)  And in her

24   response to interrogatories, Malysa confirmed that she checked the isolation cell area at

25   least once every day that she worked.  (*Id.*, Ex. P. Malysa Interrog. Resp. No. 14 (Doc. 76

26   at 76–77).)  Malysa does not deny that she had personal contact with Preayer during the

27   relevant period; she states only that she "had minimal interaction" with Preayer.  (Doc.

28   69, Ex. E, Malysa Decl. ¶ 6 (Doc. 69-3 at 3).)  To the extent that Malysa states that she

1   was not aware of issues with Preayer's cell, including sanitation, water/toilet access, and

2   meal problems, this statement conflicts with Preayer's statements that he personally

3   notified Malysa of the issues, and the Court must take Preayer's allegations as true. *See*

4   *Anderson*, 477 U.S. at 255.   Accordingly, there is a material factual dispute whether

5   Malysa was aware of conditions of confinement posing a risk of serious harm to Preayer

6   and whether she was deliberately indifferent to that risk.   Summary judgment will be

7   denied as to Malysa.

8                        **3.        Officer Ohshita**

9         Ohshita avers that she did not have any interaction with Preayer until May 1,

10   2014, when she first received his March 15, 2014 Inmate Grievance and visited his cell.

11   (Doc. 69, Ex. C, Ohshita Decl. ¶¶ 15, 17–18 (Doc. 69-2 at 21).)   Preayer does not dispute

12   that May 1, 2014, was his first personal encounter with Ohshita.   He argues, however,

13   that his March 15, 2014 Inmate Grievance put Ohshita on notice of his cell conditions

14   and that she failed to investigate or respond for months.  (Doc. 75 at 10.)

15         Preayer does not allege that he personally handed his March 15, 2014 Inmate

16   Grievance to Ohshita, and, as with Schuster, there is no evidence to suggest that Ohshita

17   was responsible for problems in the processing or delivery of inmate grievances to the

18   Grievance Coordinator.   Preayer's allegations that Ohshita purposely failed to timely

19   respond to or investigate his grievance are unsupported and merely speculative. *See*

20   *Soremekun*, 509 F.3d at 984 ("[c]onclusory, speculative testimony in affidavits and

21   moving papers is insufficient to raise genuine issues of fact and defeat summary

22   judgment").   Preayer makes much of the fact that, in her interrogatory responses,

23   Ohshita stated that she responded to Preayer's Inmate Grievance on May 5, 2014, yet the

24   Deputy Warden's Response to the Inmate Grievance is dated May 1, 2014. (Doc. 76, Ex.

25   H, Ohshita Resp. to Interrog. No. 20; Ex. J (Doc. 76 at 46, 54).)   But the face of the

26   Inmate Grievance Response reflects that it was "Received" on May 5, 2014, which

27   corresponds to the date mentioned by Ohshita.  (*Id.*, Ex. J.)

28

In short, the evidence establishes that Ohshita was first put on notice of Preayer's cell conditions on May 1, 2014.  Notably, by this time, Preayer had an operative toilet and running water, so the most egregious deprivations had been remedied.  Even assuming that Ohshita improperly tried to return Preayer's Inmate Grievance Appeal during the May 1, 2014 visit, or failed to thoroughly investigate his complaint or otherwise acted unprofessionally, such conduct does not rise to deliberate indifference. The documentary evidence shows that upon receipt of Preayer's Inmate Grievance on May 1, 2014, she forwarded it up the chain of command to the Deputy Warden the same day, and the Response was delivered to Preayer on May 5, 2014, just two days before his transfer out of the isolation cell.  (*Id.*)

Preayer has failed to present sufficient evidence to create a genuine issue of material fact on whether Ohshita acted with deliberate indifference to his conditions of confinement.  The Court will therefore grant summary judgment to Ohshita.

### 4.   Officer Piller

Piller avers that, in her role as a CO III, she had contact with all inmates in the Morey Unit, including those in the Transitory Unit.  (Doc. 69, Ex. B, Piller Decl. ¶ 3 (Doc. 69-2 at 2).)  She explains that her job required her to walk through the entire area, provide purchase order and grievance forms to inmates, and collect forms from inmates. (*Id.* ¶ 11.)  According to Piller, during Preayer's 17-week confinement in the Transitory Unit, she spoke with him one or two times a week about grievance forms and procedures. (*Id.* ¶ 17.)  She states that she does not recall Preayer ever talking about shaving, a comb, or wanting more clothes.  (*Id.*).  And, as mentioned, Piller could not find Preayer's January 29, February 14, or April 28, 2014 Inmate Letters, and states that she does not recall investigating those Inmate Letters.  (*Id.* ¶¶ 15–16.)

According to the ADC grievance procedure, all Inmate Letters go to an inmate's CO III, and Piller was Preayer's CO III.  (*Id.* ¶ 14.)  Piller's statement that she *does not recall* receiving or investigating Preayer's Inmates Letters does not prove that she did not receive them.  *See* Fed. R. Civ. P. 56(c)(4) (sworn statement used to support summary

judgment motion must be made on personal knowledge); *Bank Melli Iran v. Pahlavi*, 58 F.3d 1406, 1412–13 (9th Cir. 1995) (declaration on information and belief are entitled to no weight where declarant lacks personal knowledge).   Moreover, Preayer avers that Piller in fact responded to two of his Inmate Letters, but those responses were unreadable. (Doc. 76, Ex. A, Preayer Decl. ¶ 20 (Doc. 76 at 15).)   Preayer also documented in all his Inmate Letters that he had spoken to all Morey staff about the problems with his cell. (*See id.*, Ex. C.)

A reasonable inference from the evidence, including Piller's own averment she spoke with Preayer once or twice a week during his entire time in the Transitory Unit, is that she would have been aware of Preayer's cell conditions.  Absent evidence that Piller took any action in response to those conditions and his complaints, there exists a genuine issue of material fact whether she acted with deliberate indifference.  Summary judgment will be denied to Piller.

**IT IS ORDERED**:

(1)     The reference to the Magistrate Judge is **withdrawn** as to Defendants' Motion for Summary Judgment (Doc. 71), Preayer's Objection to the Motion for Summary Judgment as Premature (Doc. 73), and Preayer's Motion to Strike Portions of Defendants' Statement of Facts (Doc. 84).

(2)     Preayer's Objection to the Motion for Summary Judgment as Premature (Doc. 73) and Motion to Strike Portions of Defendants' Statement of Facts (Doc. 84) are **denied**.

(3)     Defendants' Motion for Summary Judgment (Doc. 71) is **granted in part** and **denied in part** as follows:

(a)     the Motion is **granted** as to Ohshita, and the Eighth Amendment claim against her is dismissed with prejudice: and

(b)     the Motion is otherwise **denied**.

(4)     Ohshita is dismissed as a Defendant.

(5)     The remaining claims are the Eighth Amendment claims in Count I against Schuster, Malysa, Piller, Barajas, and Arreola, and Count II against Tucker.   Having chosen to file a fully-briefed motion for summary judgment on the Count I Eighth Amendment claims against Schuster, Malysa, and Piller, Defendants may not file another Rule 56 motion on these claims against these Defendants.

Dated this 22nd day of September, 2016.


_____
David G. Campbell
United States District Judge